THE CITY OF CHICAGO HEIGHTS, Plaintiff-Appellant, *v.* OLD ORCHARD BANK TRUST CO., Trustees, *et al.*, Defendants-Appellees.

First District (4th Division)    No. 80-596

Opinion filed May 21, 1981.

James F. Creswell, of Chicago Heights, and Andrew M. Raucci, of Chicago (Kusper & Raucci, Chartered, of counsel), for appellant.

Peter B. Carey and Timothy J. McGonegle, both of Chicago (O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., of counsel), for appellees.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiff, City of Chicago Heights, brought this action in the circuit court of Cook County seeking a declaratory judgment and an injunction against the various defendants. The basic controversy was over the interpretation of a zoning ordinance which provided that specific property could be used as a "nursing home" and whether defendants' use of the property complied with the ordinance. The trial court granted defendants' motion to dismiss the complaint, holding as a matter of law that defendants were not using the property in violation of the ordinance. Plaintiff appeals.

We affirm.

*Background Data*

The essential facts alleged in the complaint are as follows.

On June 24, 1974, plaintiff, a home-rule unit, entered into a contract with two companies, Farbeck Corporation and S & L Engineering (neither of these companies is a party to this action). At the time, Farbeck was the owner of land located within plaintiff's city limits, and S & L had an option to purchase that land. Also, at the time, the land was in an area zoned as a limited business district which did not allow for nursing homes. S & L wanted to purchase the land but would not do so unless it could construct a nursing home on it.

Under the agreement, plaintiff promised to enact an ordinance changing the land's zoning classification to a general residence district which allowed the construction of nursing homes as a special use. Plaintiff also promised to issue S & L a special use permit allowing it to "establish" a nursing home on the land.

In return, Farbeck and S & L promised to establish a nursing home on the land. The nursing home was to be built according to various plans incorporated in the contract.

The final term of the contract read as follows:

"This Agreement and the Ordinance providing for the zoning change and the Special Use Permit shall apply solely to the parties hereto and there shall be no assignments of this Agreement."

The interpretation and effect of this clause forms one of the issues raised in this case.

On the same day the agreement was signed, plaintiff enacted the zoning ordinance required by the agreement. The ordinance provided for the zoning change and for the issuance of a special use permit to "establish" a nursing home. One clause of the ordinance read as follows:

"[T]he owners of the [land], their successors and assigns, shall at all times provide and maintain a five to seven foot visual buffer consisting of a solid wall, fence or densely planted compact hedge to screen parking areas adjoining [the surrounding property]."

The effect this clause had on the above mentioned clause in the contract is also at issue in this case.

Apparently on the same day or shortly thereafter, Farbeck transferred ownership of the property to defendant Old Orchard Bank & Trust Co. Old Orchard was simply a land trustee with S & L the beneficiary of the trust. Also, plaintiff issued a special use permit to S & L so S & L could "establish" a nursing home on the land.

S & L constructed the nursing home. Thereafter, in May 1977, Old Orchard Bank, pursuant to S & L's direction, entered into a lease of the property with defendant LaSalle National Bank. It was a long-term lease with options to renew and an option to purchase. Under the lease, LaSalle National was required to use the property only for a nursing home. LaSalle National was simply a land trustee and defendants Morris Esformes, Yosef Davis, and their partnership called the Chicago Heights Terrace Limited Partnership, were the beneficiaries of the trust. These latter defendants (hereinafter called the partnership) set up operations in the nursing home. The partnership has been operating the nursing home since May 1977. The nursing home, at the time this action was brought in February 1979, had close to 250 patients. Many of these patients were old people. However, at least half of them were younger adults suffering from varying degrees of mental disorders. Most of these mental patients

had been permanently discharged from various State and private mental institutions because they no longer required regular treatment. None of them was alleged to pose any specific danger to themselves or to persons in the community.

Plaintiff's complaint sought several forms of relief. Essentially, plaintiff alleged that the special use permit had been assigned by S & L in violation of the original agreement and was thus no longer in effect, and plaintiff should be deemed to have the right to close the home. Also, in the alternative, plaintiff alleged that the home was being operated in violation of a city ordinance which defined a "nursing home" as follows:

> "A home for the care of children or the aged or infirm, or a place of rest for those suffering bodily disorders, but not including facilities for the treatment of sickness or injuries or for surgical care."

Plaintiff alleged that this ordinance prohibited the partnership from housing mentally ill patients and alleged that the partnership was using the home for the "treatment of sickness" in violation of the ordinance. Plaintiff sought an injunction to prevent the partnership from continuing to violate the ordinance.

The trial court dismissed the complaint pursuant to defendants' motion to do so.

OPINION

I

*Alleged Assignments*

Plaintiff first contends that the special use permit was assigned in violation of the original agreement and as a result, the permit is no longer in effect. Plaintiff's argument is that S & L is the only organization which had any rights under the permit and S & L is the only organization that could operate a nursing home on the land, and if S & L attempted to allow anyone else to operate a nursing home, the original agreement would be breached because such action would constitute an assignment of the special use permit in violation of the agreement and the permit would become void as a result.

We disagree with plaintiff's contention that there was a breach of the original agreement. To begin with, the original agreement did not specifically prohibit the assignment of the special use permit. The pertinent clause in the contract says:

> "This Agreement and the Ordinance providing for the zoning change and the Special Use Permit shall apply solely to the parties hereto and there shall be no assignments of this Agreement."

■■ Of particular note is that the clause refers to the agreement, the

ordinance, and the special use permit as three different things, but prohibits only assignments of the agreement. The agreement simply provided that plaintiff would enact the required ordinance and issue the special use permit. In return, S & L was required to "establish" a nursing home on the property. An assignment is the transfer of some property, claim, or right from the assignor to the assignee. (*Buck v. Illinois National Bank & Trust Co.* (1967), 79 Ill. App. 2d 101, 223 N.E.2d 167.) The only rights S & L could have been prohibited from assigning under the agreement were the rights to have the ordinance enacted and the special use permit issued. S & L never assigned these rights. The ordinance was enacted and the special use permit was issued to S & L. After this, S & L could no longer assign any rights under the agreement because plaintiff had fully executed its part of the agreement. If plaintiff owed no further duty to S & L under the agreement, S & L could hardly assign to another party a right to have any such phantom duty performed. Since the clause in the contract prohibited only the assignment of the agreement, and, by the terms of that clause, the special use permit itself was something different from the agreement, there was no specific prohibition against assigning the special use permit.

The difficulty with the contract term is determining what was meant by the statement that the special use permit would apply solely to the parties to the contract. Did this mean that no one else but S & L could use the property as a nursing home? Undoubtedly, it did not.

Under the agreement, the special use permit was to be issued to S & L so it could "establish" a nursing home. The plaintiff was undoubtedly relying on S & L, an admitted specialist in building nursing homes, to construct the home, but the special use permit contained no specific requirement for S & L to manage and operate the home. Clearly, the contract term must only have meant that S & L would be the sole party responsible for constructing or "establishing" a nursing home on the property, and to this extent the permit could only be used by S & L. In other words, the contract term was only intended to be a prohibition which prevented S & L from delegating its duty to a third party to construct or "establish" a nursing home on the property. ·

This interpretation of the contract term is supported by the clause in the zoning ordinance which requires the owner of the property, his "successors or assigns," to maintain a barrier around the nursing home. This clause contemplated that after the home was built there could be successors or assigns to the property and to the specific use of the property.

Finally, our interpretation of the contract term is supported by the fact that the legality of the term would be doubtful if the plaintiff had

truly intended to limit the use of the property solely to the first owner and thereby prohibit the right to use the property as prescribed from running with the land.

Since S & L established the nursing home according to the terms of the agreement and the special use permit, there was never any breach of the original agreement. S & L is still the beneficial owner of the property and the holder of the special use permit, and nothing in the agreement prohibited S & L from leasing the property and allowing the partnership to manage and operate the nursing home.

Accordingly, we hold that plaintiff's first contention is without merit.

## II

*Ordinance Interpretations*

■■ Plaintiff next contends that the present operation of the nursing home is in violation of the ordinance defining "nursing home," which reads:

> "A home for the care of children or the aged or infirm, or a place of rest for those suffering bodily disorders, but not including facilities for the treatment of sickness or injuries or for surgical care."

Plaintiff contends that this ordinance prohibits the nursing home from being used as a place for the housing and care of persons with mental incapacities. We disagree.

Language in zoning ordinances should be interpreted in favor of the free use of property. (*County of Lake v. First National Bank* (1979), 68 Ill. App. 3d 693, 386 N.E.2d 394.) Ambiguities should be resolved against the enacting authorities. (*Lubershane v. Village of Glencoe* (1978), 63 Ill. App. 3d 874, 380 N.E.2d 890.) Necessarily, in determining the meaning of an ordinance, effect should be given to the intention of the drafters by concentrating on the terminology, its goals and purposes, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the ordinance. *Palella v. Leyden Family Service & Mental Health Center* (1980), 79 Ill. 2d 493, 404 N.E.2d 228.

■■ In the present ordinance, a nursing home is defined in part as a place for "the care of children or the aged or infirm, or a place of rest for those suffering bodily disorders * * *." We believe the word "infirm" in this ordinance allows for the present use of the nursing home. "Infirm," in common usage, is defined as "not strong or sound physically" or "weak of mind, will, or character." (Webster's Third New International Dictionary 1159 (1971).) We believe this term is sufficiently broad to encompass those suffering from mental disorders.

Plaintiff contends the word "infirm" was only intended to cover those suffering physical weaknesses. However, the ordinance also states that a

nursing home is a place of rest for those suffering from physical disorders. This latter clause would be mere surplusage if "infirm" was intended to mean only those suffering from physical disabilities. Key terms in an ordinance should be assumed to have a meaning different from other terms in an ordinance. (See *In re Estate of Cregar* (1975), 30 Ill. App. 3d 798, 333 N.E.2d 540.) Thus, we believe that the first part of the ordinance allows for the home to care for those suffering from mental disorders.

Plaintiff points to the second part of the ordinance which prohibits the home from being a place for the "treatment of sickness or injuries or surgical care," and alleges this portion of the ordinance prohibits the present use of the home.

■■ "Treatment" is a word subject to various interpretations. A nursing home would undoubtedly engage in some minimal degree of "treatment," but is not expected to engage in that degree of "treatment" usually associated with a hospital or mental institution. (See section 1 of the Nursing homes, sheltered care homes, and homes for aged Act (Ill. Rev. Stat. 1977, ch. 111½, par. 35.16) (repealed 1979); see section 1—113 of the now Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—113).) In the present ordinance, it is apparent that the prohibition against treatment was meant to prohibit that degree of treatment usually associated with a hospital or mental institution. The ordinance prohibits "treatment of sickness or injuries or for surgical care." This phrase, read as a whole, implies that the governing authorities meant to prohibit that immediate and extensive treatment provided by a hospital or mental institution usually required for sick or injured persons needing such treatment. We note that the first part of the ordinance allows for the care of the infirm and those suffering bodily disorders. Thus, the ordinance necessarily was intended to allow for some degree of treatment because the infirm and those suffering bodily disorders would always require at least a minimal degree of treatment, as would the aged.

The patients with mental disorders now residing in the home are mostly persons who have been permanently discharged from mental institutions as not requiring regular treatment. They are admittedly able to function with a minimal degree of care within an institutionalized surrounding. Hence, we believe that these persons are not being "treated for sickness" as that phrase is used in the ordinance.

Accordingly, for the reasons noted, we affirm the decision of the trial court.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.