**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230749-U

Order filed November 21, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| VILLAGE OF BOLINGBROOK, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff and | ) | Will County, Illinois, |
| Counterdefendant-Appellee, | ) | |
| | ) | Appeal No. 3-23-0749 |
| v. | ) | Circuit Nos. 22-CH-198 & 23-MR-19 |
| | ) | cons. |
| RE LAND IL II, INC., | ) | |
| | ) | Honorable |
| Defendant and | ) | John C. Anderson, |
| Counterplaintiff-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The trial court's issuance of a preliminary injunction to prevent use of the subject property as a truck parking business in violation of the Bolingbrook Village Code and to return the condition of the property to its last, actual, peaceable, and uncontested status preceding the controversy was not an abuse of discretion. Affirmed.

¶ 2    The Village of Bolingbrook (Village) is the plaintiff and counterdefendant. RE Land IL

II, Inc. (RE Land) is the defendant and counterplaintiff. In September 2022, RE Land purchased

263 acres of property located in the Village for $27 million from H&H Stone LLC. This case involves the Village's subsequent lawsuit against RE Land for injunctive relief to prevent RE Land from using the property as a truck parking lot business in violation of various provisions of the Bolingbrook Village Code. Following an evidentiary hearing, the trial court issued a preliminary injunction ordering RE Land to refrain from using the property as a truck parking lot and to return the use and condition of the property to the last, actual, peaceable, and uncontested status preceding the controversy. RE Land filed a notice of interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). For the reasons set forth below, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4       We first discuss the subject property and then recount in relevant part the procedural history, evidentiary hearing, and the trial court's ruling.

¶ 5                                        A. Property

¶ 6       The 263-acre parcel of land that RE Land purchased in September 2022 is located at 135th Street and Essington Road with an address of 1421 West 135th Street, Bolingbrook. There is a 17.33-acre parcel of land directly across and to the south of 135th Street (south parcel). The entirety of the property was annexed into the Village pursuant to a November 10, 1992, annexation agreement with the owner of the property at the time (Elmhurst-Chicago Stone Company). The annexation agreement provided that "[t]he Subject Property is currently used for commercial activities including the mining and sale of minerals, sand, gravel, topsoil and other aggregates" and that the Village "hereby agrees to adopt the necessary ordinances to zone the Subject Property I-2, General Industrial District and to approve special use permits with the

2

following provisions ***." Bolingbrook Village Ordinance No. 92-136, § 3 (approved Nov. 10, 1992). The provisions included, *inter alia*:

> "(C) The Village agrees that all structures and improvements now located on the Subject Property shall not be subject to Village building, health, safety, zoning and fire codes *until such time as improvements or repairs are made to said structures*. All improvements and repairs to said structures shall be subject to Village codes and ordinances in effect at the times such repairs and improvements are made." (Emphasis added.) *Id.* § 3(C).

¶ 7    The annexation agreement further sets forth the Village's "acknowledge[ment] that mining is a permitted special use within the I-2 zone, that said zoning permits the current mining, asphalt and ready-mix operations on the Subject Property, and that said zoning and special use runs with the land." *Id.* § 3. In accordance with the annexation agreement, the Village subsequently rezoned the property I-2 and granted a special use permit running with the land for "mining, asphalt, and ready-mix operations." Bolingbrook Village Ordinance No. 92-172 (approved Dec. 8, 1992). The annexation agreement sets forth a November 10, 2012, expiration date, although section 11-15.1-2 of the Illinois Municipal Code (65 ILCS 5/11-15.1-2 (West 2022)), provides that, after the term of an annexation agreement and unless otherwise provided for in the annexation agreement or an amendment thereto, the provisions of any ordinance relating to the zoning of land provided for within the agreement or an amendment thereto shall remain in effect unless modified in accordance with law.

¶ 8    In 2013, Elmhurst-Chicago Stone Company sold the entirety of the property to H&H Stone. In 2015, H&H Stone sold 5 acres of the 17.33-acre south parcel to Welsh Ready Mix, Inc. In 2018, H&H Stone sold the remaining 12.33 acres of the south parcel to Daria Property, Inc.,

which is owned by Artem Zakharov. As noted, on September 30, 2022, H&H Stone sold the 263-acre parcel to RE Land, which is also owned by Zakharov.

¶ 9                                    B. Procedural History

¶ 10            On November 30, 2022—one month after RE Land closed on the property—the Village initiated this action by filing a verified complaint for injunctive relief against RE Land pursuant to section 11-13-15 of the Illinois Municipal Code (65 ILCS 5/11-13-15 (West 2022) ("Proceedings to prevent violation [of municipal ordinance]")). The five-count complaint alleged nuisance in that RE Land: (1) engaged in development without a development plan in violation of section 30-7 of the Bolingbrook Village Code (Code) (eff. Jan. 25, 1994); (2) engaged in development without a site development permit in violation of section 16-61 of the Code (eff. Feb. 10, 1993); (3) was operating a truck parking business without obtaining a business license in violation of section 12-23 of the Code (eff. Aug. 9, 2022); (4) created an off-street parking facility, as defined in section 54-532 of the Code, which was noncompliant with the design and maintenance requirements set forth in section 54-533 of the Code (eff. Sept. 24, 2013); and (5) was operating a truck parking facility with unsafe conditions in that the facility lacked the requisite lighting for off-street parking in violation of section 30-173(f) of the Code (eff. Feb. 25, 2020) and lacked water service—creating a fire hazard—in violation of section 54-86 of the Code (eff. Jan. 28, 1975).

¶ 11            The complaint alleged that the property has historically been used as a quarry and/or a mining operation and that, on September 14, 2022, Village officials met with RE Land's representatives to discuss a potential development plan following RE Land's anticipated purchase of the property. According to the complaint, at the meeting, RE Land "was informed of certain requirements with respect to any potential truck parking facility, including the proper

4

surface, fire prevention and water access, lighting and other safety measures, and landscaping concerns" and "[i]t was further discussed that a possible development agreement would be required to govern this type of proposed development and that the Village would be willing to work with [RE Land] to come to mutually agreeable terms with respect to same." The Village allegedly received no further response, request, or follow-up from RE Land after the meeting. However, following its purchase of the property, RE Land allegedly began ongoing site development and construction activities and began to use the property as a truck parking lot in violation of the Code.

¶ 12        The complaint states that the Village issued a stop-work order "directing the owner to immediately cease construction at the subject property" and that "Defendant ignored the Stop Work order and continued constructing the parking surface." In addition, "[a]s of November 30, 2022, the Village has issued and served eight (8) citations upon Defendant, but Defendant continues with development and construction work along with the operation of its business." The Village sought an order enjoining RE Land, on a temporary, preliminary, and permanent basis, from engaging in all construction activity at the property and from using the property as a truck parking lot in violation of the Code.

¶ 13        Thereafter, on December 6, 2022, the Village filed a motion for a temporary restraining order and preliminary injunction to enjoin RE land from engaging in development and construction activity at the property in violation of the Code and from operating a truck parking business at the property. The Village argued that it established that RE Land was engaging in development and construction activity and operating the property as a truck parking lot without having first obtained Village review and approval of the development, a site development permit,

and a business license and without water service, adequate lighting, and a compliant parking surface.

¶ 14　　On December 8, 2022, RE Land filed an answer and affirmative defenses and response to the Village's motion. RE land denied all material allegations, argued that an evidentiary hearing was required, and raised four affirmative defenses: (1) "Annexation Agreement/Special Use Permit Bars These Claims"; (2) "Grandfathering"; (3) "Estoppel"; and (4) "Waiver." RE Land asserted that it continues to use the property as a quarry, for clean construction or demolition debris, and for other permissible uses—all in continuation of prior uses. In facts common to all affirmative defenses, RE Land alleged that, prior to its purchase of the property, H&H Stone continually used the property for "mining, blasting rock out of the ground, using heavy equipment and trucks to transport the mined material offsite, parking or storing trucks and other heavy equipment, and maintaining, servicing, and repairing the trucks and other heavy equipment when not in use." RE Land further alleged that, after its purchase of the property, H&H Stone—now as a lessee of the property—continues to use the subject property for these same purposes.

¶ 15　　In support of the first affirmative defense, RE Land alleged that the annexation agreement prohibits the Village from enforcing its "building, health, safety, zoning and fire codes until such time as improvements and repairs are made" to the property and that no improvements or repairs have been or are being made to the property. Next, regarding its affirmative defense of "grandfathering," RE Land alleged that, both prior to and after RE Land's purchase of the property, H&H Stone engaged in comparable activities at the property through its mining operations in that it "has built berms and parking pads"; "parking pads are created when H&H

moves earth around the Property"; and H&H Stone frequently parked and continues to park trucks and heavy machinery on the parking pads.

¶ 16　　　　Regarding the affirmative defense of estoppel, RE Land alleged that it had detrimentally relied upon a preclosing September 9, 2022, letter from the Village to RE Land, stating that there were no pending zoning violations. And finally, with respect to its affirmative defense of waiver, RE Land alleged that the Village never issued any citations to H&H Stone for its activities at the property.

¶ 17　　　　Thereafter, RE Land also filed a counterclaim for declaratory and other relief (which was consolidated into this action), seeking a declaration that an ordinance passed by the Village on October 25, 2022 (after the closing), was invalid in that it impermissibly modified the definition of "Motor Freight Terminal" and eliminated it as a permissible use for I-2 zoned properties. Neither the counterclaim nor the challenged ordinance are at issue in this appeal.

¶ 18　　　　　　　　　　　　C. Evidentiary Hearing

¶ 19　　　　The trial court held an evidentiary hearing over the course of four days in September 2023. The Village presented the testimony of Thomas Pawlowicz (Village Engineer), Matthew Eastman (the Village Director of Community Development), Jeffrey Lajoie (the Village Fire Chief), Frank Arford and Joanne Adler (two residential neighbors), and, as an adverse witness, Zakharov. RE Land presented the testimony of Dale Wheeler (its fire safety expert), David Hamman (the principal of H&H Stone), John Duggan (the former attorney for H&H Stone), Zakharov, and, as adverse witnesses, Pawlowicz and Eastman. Numerous exhibits were admitted into evidence, including all relevant Village ordinances and Code provisions, past and current photographs of the property, and documents pertaining to RE Land's cost for the challenged activity at the property. We summarize the relevant evidence.

7

¶ 20 Hamman testified regarding areas "reclaimed" (filled in, regraded, and capped with limestone screenings and asphalt grindings) during H&H Stone's ownership of the property. H&H Stone reclaimed 12.33 acres of the western portion of the south parcel and rented the property to two companies—an industrial electrical contracting company and a pipeline company—for, respectively, staging their industrial equipment and storing service trucks. The items stored included semi-trucks and trailers and heavy industrial machinery and equipment. Zakharov testified that when Daria purchased this parcel, it likewise allowed trucks to park there pursuant to a lease. Hamman further testified that, on the 263-acre parcel, H&H Stone reclaimed a five-acre and twelve-acre area and built "pads" where it parked some of its equipment and trucks and where third parties also parked. It had also reclaimed another 20 acres by 2018. Hamman testified that H&H Stone was never required to obtain a site development permit or business license and was never asked to install a particular parking surface, curbing, lighting, or a fire suppression plan with the Village.

¶ 21 However, Hamman acknowledged that, during H&H Stone's ownership of the property, virtually everything it did at the property was quarry-related; H&H Stone never made any parking pads that were not incidental to quarrying and mining; and it never operated a truck parking business at the property. He also acknowledged that the southwest portion of the property was a fill area; no commercial activity took place there; and H&H Stone never hired any outside subcontractors to make any grading changes and never paid any subcontractors to fill the property.

¶ 22 On September 9, 2022—shortly before RE Land's September 30, 2022, closing on its purchase of the property from H&H Stone—Eastman issued a zoning clearance letter, at RE Land's request, stating, *inter alia*, that "[t]here is no pending zoning action or outstanding zoning

8

violations, the Premise [*sic*] is in compliance with all applicable zoning regulations, and the Premise [*sic*] is not part of any special restrictive overlay district."

¶ 23     On September 14, 2022, Village representatives and RE Land representatives met at the Village Mayor's office. Both Zakharov and Eastman testified regarding the meeting. Zakharov testified that, in addition to himself, "the previous mayor, the current mayor, village engineer, village manager, [and] two attorneys" were present at the meeting. At the meeting Zakharov discussed "short term use of the property and long term plans," and stated that, if he purchased the property, he would "start parking trucks immediately on the pad that's already there" and that he would like to have a "bigger parking area in the future." Zakharov acknowledged that compliance with Code provisions was discussed but only in the context of a future industrial development with a large truck parking lot, not for Zakharov's immediate plans. Zakharov testified that, upon disclosing his plans, he was never told that he could not park trucks there.

¶ 24     Eastman testified that, at the September 14, 2022, meeting, Zakharov advised that he was considering purchasing the quarry property and intended to use the property as a massive truck parking lot. Eastman testified that, in response, he advised Zakharov that he would be required to construct the parking lot in compliance with section 54-533 of the Code, which sets standards for the construction of off-street parking facilities in the Village.

¶ 25     On September 29, 2022, the Village issued a "REAL ESTATE TRANSFER TAX STAMP COMMERCIAL CLEARANCE LETTER" to RE Land. Eastman testified that this letter encompassed his approval, "on behalf of the building division and engineering and planning and zoning" departments that there were no taxes owed and no outstanding zoning violations. The next day, on September 30, 2022, RE Land closed on its purchase of the property from H&H Stone.

¶ 26    The testimony established that, following the closing, H&H Stone continued to operate at the property pursuant to the purchase agreement and a short-term lease and that RE Land hired Hamman to do work to the southwest portion of the property. Specifically, Hamman retained various earth-moving subcontractors who used earth-moving equipment to elevate the southwest portion of the property by three feet, flatten the southwest portion of the property, and cover it with a layer of limestone, topped by a 10-inch layer of old asphalt grindings. H&H Stone paid the subcontractors, and Zakharov or one of his companies would reimburse H&H Stone. Invoices reflected over $100,000 paid to subcontractors in November 2022 and December 2022 related to these activities.

¶ 27    Pawlowicz testified that, on November 17, 2022, he was inspecting the property across the street from the subject property and noticed earth-moving equipment and stakes in the ground on the site. He drove onto the property and took photographs. Based on his knowledge of quarrying, what he observed that day was not reclamation. The workers were spreading limestone—the very material mined at the quarry—onto the southwest portion of the property. Based on these observations, he suspected that the owner was engaged in site development and therefore sent the photographs to Eastman, who enforces the Village's development and zoning codes.

¶ 28    Eastman testified that, given the discussion at the September 14, 2022, meeting, when Eastman received the photographs, he was concerned that the earth-moving work at the quarry constituted site development without a permit. Eastman testified that he had toured the property in the summer of 2022 at Hamman's invitation and did not see any earth-moving activity occurring at the southwest portion of the quarry property. Eastman directed that additional photographs be taken of the earth-moving equipment to confirm Pawlowicz's information. The

additional photographs, depicting what Eastman described as a "large-scale" earth-moving operation, were admitted into evidence. Eastman testified that, following his review of the photographs, he determined that RE Land was engaged in site development without a site development permit.

¶ 29   At Eastman's direction, on November 17, 2022, the notice to stop work was served on the contractors on site, and citations were issued to Zakharov at the end of November 2022. However, the activity continued. Eastman testified regarding aerial photographs of the property, taken on December 19, 2022, which reflected use of the quarry property as a parking lot with "Jersey walls with individual numbers on them signifying the individual parking stalls" and with trucks "side by side all the way down in rows." Evidence was introduced that AZ Truck Parking (also owned by Zakharov) advertised for a truck parking business on the site in December 2022.

¶ 30   Arford and Adler, residents from the neighboring community, testified regarding the increased truck traffic and the 24/7 nature of the operation, dust emanating from the property, and concerns about dust and pollution. Evidence was also introduced regarding H&H Stone's late 2021/early 2022 demolition of a portion of the berm located around the southwest corner of the property after which neighbors complained about the unsightliness, noise, and dust. In addition, Zakharov testified that there was a March 2023 Illinois Environmental Protection Agency (IEPA) investigation pursuant to which "no violations were found" and that there were complaints from the IEPA in July 2023, including "[o]ne [] about dust and they found no violations from our site, you know, in regards to dust."

¶ 31   With respect to the off-street parking requirements in section 54-533 of the Code, while Zakharov testified to his understanding that asphalt grindings are sufficient, Eastman testified that asphalt grindings do not constitute the requisite all-weather dust-free surface. Rather, an all-

11

weather dust-free surface means hot asphalt, concrete, or brick. The purpose of this requirement is to ensure not only that the vehicles operating on the property are not disturbing and kicking up dust but also that the vehicles are not bringing the debris out to the public right of way. Eastman testified that RE Land was required to submit a photometric plan for lighting to the Village, which RE Land never did. Eastman further testified that the purpose of curbing, which was not done, is to contain the vehicles that are on site, to create efficient traffic movement throughout the parking lot, and to direct overflow of water. Zakharov testified that the parking lot was "temporary," and he therefore was not required to comply with section 54-533.

¶ 32        As for the fire safety system, Wheeler testified that, based upon the manner in which the semi-trucks and trailers are parked, the rules and regulations in place at the quarry, and the low fire load, the probability of the occurrence of a fire there is low and the severity of any such fire marginal. He further opined that connecting Village water to the quarry would not provide additional safety measures because water is not the appropriate method to combat a diesel fire. LaJoie, however, testified regarding the importance of a fire suppression system as follows:

> "Just the lack of water supply and the lack of lighting, the orientation of the trucks not having any ability to [] plan or have input on the development can really set us back in our operations, and then that puts our people at risk. And if there was a conflagration, it could be very detrimental to the environment because every truck carries a couple hundred gallons of diesel fuel, and then we don't know what the cargo is. Cargo is always a concern."

¶ 33        Following the evidentiary hearing, the trial court took the matter under advisement, and the parties thereafter submitted proposed orders.

¶ 34                                D. Trial Court's Ruling

12

¶ 35    On November 16, 2023, the trial court issued a written memorandum opinion and order, finding that the Village established the requisite elements for issuance of a preliminary injunction. Initially, the trial court found that the Village has a clear and ascertainable right to have its ordinance and Code provisions enforced to protect the public's health, safety, and welfare. Next, while noting that a public body need not show irreparable harm or an inadequate remedy at law when seeking an injunction to enforce an ordinance, the trial court found that the Village "has easily done so," in that "[w]hen a landowner or other person is permitted to disregard code and ordinances, and the municipality is unable to enforce its own laws, the municipality suffers irreparable harm without an adequate legal remedy."

¶ 36    The trial court proceeded to find that the Village demonstrated a likelihood of success on the merits as to all counts except count I for failure to obtain a site development plan. Regarding count II for failure to obtain a permit, the trial court found that the Village established that RE Land engaged in land disturbing activity without a site development permit in violation of section 16-61 of the Code. Regarding count III for failure to obtain a business license in violation of section 12-23 of the Code, the trial court found that a truck parking business is being operated at the property by or on RE Land's behalf and that no business license has been requested or issued for such a business. The trial court rejected RE Land's reliance upon H&H Stone's lack of a business license since H&H Stone operated a quarry, not a truck parking business. The trial court pointed out that quarry operations are licensed and governed by state law and that, under the Code, businesses licensed by the state are exempt from the business license requirement.

¶ 37    As for count IV's off-street parking requirement claim, the trial court found that the truck parking lot violates the Village's design standards for off-street parking, as set forth in section 54-533 of the Code, in three ways—no all-weather dust-free surface, no curbing, and no lighting.

13

Initially, the trial court found circular RE Land's assertion that it was not required to comply with section 54-533 because the parking lot was "temporary." That is, RE Land "gets to decide when its parking lot becomes a parking lot subject to regulation and that the truck parking lot is not subject to regulation until it is properly paved. Under this logic, [RE Land] could essentially operate the truck parking business in a non-compliant state and evade the code requirements indefinitely *because* it does not conform to code requirements." (Emphasis in original.) The trial court also found not credible Zakharov's testimony that he would not have purchased the property if he believed that he had to comply with section 54-533, as the testimony suggested that, unless legally obligated, he would never construct off-street parking compliant with section 54-533.

¶ 38      Turning to the alleged violations of section 54-533, the trial court first considered the lack of an all-weather dust-free surface. The trial court noted the undisputed fact that the parking lot surface is comprised of asphalt grindings and credited Eastman's testimony that asphalt grindings do not constitute an all-weather dust-free surface and that an all-weather dust-free surface means hot asphalt, concrete, or brick. The insufficiency of asphalt grindings was corroborated by the credible testimony of the neighboring residents, *i.e.*, Adler, who testified that she regularly sees clouds of dust emanating from the truck parking lot and Arford, who testified that the truck parking lot raises concerns about dust and pollution. The trial court found Zakharov's belief that asphalt grindings constitute a compliant surface to be not only self-serving, but also irrelevant, given Eastman's responsibility to administer and enforce the Code and the deference afforded an agency's interpretation of any ambiguous ordinances it enforces. Accordingly, the trial court found that the evidence established that the property is being used for

14

off-street parking, which does not comply with section 54-533 because it is not paved with hot asphalt, concrete, or brick.

¶ 39 Second—lack of curbing—the trial court noted that curbing serves the important function of containing the vehicles on site and that it was undisputed that the off-street parking facility lacks curbing.

¶ 40 Third—lack of lighting—the trial court noted the importance of lighting for first responders in the event they need to quickly provide aid at the property and found that the lack of any lighting servicing the truck parking lot created significant safety issues. Citing the requirement in section 54-533 of the Code that "[l]ighting used to illuminate off-street parking areas shall be provided as required in section 30-173," the trial court also reasoned that RE Land never submitted a photometric plan to the Village as required by section 30-173(f)(6) of the Code. In rejecting RE Land's reliance on the Village never having required H&H Stone to install lighting, the trial court distinguished the previous use of the property as a quarry from the present use as a truck parking facility. The distinctions included that the truck parking business is a 24/7 operation allowing hundreds of invitees access to the property, while the quarry maintained business hours, and that, unlike quarry rocks and machinery, a large number of unattended semi-trailers in a location with no lighting is attractive to criminals.

¶ 41 As for count V's claim regarding the lack of safety systems, the trial court again set forth the lack of compliant lighting and noted that, given the change in use of the property, the previous lack of lighting at the property did not permit RE Land to disregard the Code requirements. Likewise, the trial court found the Village justified in requiring a fire suppression system, which RE Land never submitted to the Village for assessment. The trial court pointed out that, because the property had been annexed while used solely as a quarry, it is not serviced

15

by a municipal water supply and there are no fire hydrants. Citing Lajoie's testimony, the trial court noted the importance of a fire suppression system "when there are a large number of trucks carrying diesel fuel and there is no way to govern what, if anything, is stored inside the trucks." While a fire at the truck parking lot may not spread to the neighboring residential properties, the trial court found that the same cannot be said of the byproducts of such a fire, taking judicial notice "based on common sense and everyday experience that massive, toxic fires happen on a regular basis, and that it takes just one careless act to set off a tragic chain of events culminating in toxic releases which endanger neighboring communities." Indeed, the trial court noted Zakharov's admission that RE Land neither monitors nor regulates the contents of the trailers stored at the property and that "[h]undreds of trucks and trailers which can be filled with virtually anything are parked and stored at the property, despite the complete lack of an approved fire suppression system." The trial court concluded that Wheeler's testimony as to a low fire risk did not warrant disregarding fire safety measures.

¶ 42        Turning to RE Land's affirmative defenses, the trial court found no basis upon which to conclude that RE Land could succeed on any of the defenses. First, the trial court found that RE Land's grading, elevation, and other work constitute "improvements and repairs" to the property sufficient to justify the Village's efforts to enforce its building, health, safety, zoning, and fire codes such that RE Land could not rely on the annexation agreement's prohibition on enforcing these codes until such time as "improvements and repairs" are made to the property. The trial court further found that the special use permit "does not permit the large-scale parking and storage of over the road semi-trucks unrelated to quarrying on a non-compliant surface without curbing, lighting and drainage."

16

¶ 43        Second, as to RE Land's affirmative defenses of "grandfathering," the trial court, *inter alia*, rejected RE Land's assertion that the work performed at the southwest portion of the property is a continuation of activity performed by H&H Stone. The trial court noted that RE Land's own witnesses undermined the assertion. Hamman testified that H&H Stone only added fill to the property and merely created a generic flat area for potential subsequent development and use, whereas, after the sale of the property to RE Land, it built a truck parking lot for RE Land. The trial court further noted that Hamman's testimony reflected the contrast between the fill activity during H&H Stone's ownership and the site development work performed during RE Land's ownership. Namely, in November 2022 and December 2022, RE Land paid significant sums to modify the grade and elevation of the property and raised the elevation by three feet whereas during H&H Stone's ownership, H&H Stone never used outside contractors to fill the southwest portion of the property. Indeed, Duggan (H&H Stone's former attorney) characterized the work performed at the southwest portion of the property as "construction work."

¶ 44        Moreover, while Hamman acknowledged that the new truck parking lot has no nexus to the quarry, the trial court found that, during H&H Stone's tenure, "virtually everything it did at the property was related to the quarry operation, as it was authorized to do pursuant to the special use permit." Hamman also testified that the previously created parking pads were necessary for the quarry operations. Accordingly, the trial court concluded that H&H Stone's parking and storage of its quarry trucks and equipment on flat areas within the quarry does not "grandfather" the new use of the southwest corner as a semi-truck parking lot. Rather, the trial court found it "transparently obvious that the scheme to have H&H pay outside contractors, and then receive reimbursement from Mr. Zakharov, was conceived by Mr. Zakharov [record citation] to create

17

the illusion that the site development activity was nothing more than H&H continuing to do what it had done during the nine years it owned the quarry property."

¶ 45      Third, the trial court rejected RE Land's affirmative defense of estoppel, finding that RE Land failed to present evidence of an affirmative act by an official with express authority to bind the Village so as to establish the requisite act inducing reliance. The trial court reasoned that Eastman credibly testified that, in September 2022, he advised Zakharov that he would need to comply with section 54-533 of the Code, whereas Zakharov testified that, at most, in September 2022, the Village did not expressly advise him that he could *not* park trucks at the property.

¶ 46      Fourth and last, the trial court rejected the argument that the Village waived the development and site development requirements by never issuing any citations to H&H Stone for the alleged conditions about which it now complains. The trial court found that none of the alleged conditions or conduct existed prior to the sale of the property to RE Land. And, to the extent RE Land relied on H&H Stone's previously created parking pads and isolated allowance of non-quarry related vehicles to be stored on the property, there was no evidence that the Village had knowledge of these activities. To the contrary, Eastman testified that, when he toured the property in June 2022, he did not see parking pads in the quarry.

¶ 47      Having concluded that the Village demonstrated a likelihood of success on the merits as to counts II through V, and having rejected RE Land's affirmative defenses, the trial court turned to the balancing of hardships, rejecting the Village's argument that a balancing of hardships was not required given the "self-inflicted" nature of RE Land's consequences. The trial court concluded that the balancing amounted to a "slight tilt" in the Village's favor. While the trial court recognized the financial hardship to RE Land from the issuance of injunctive relief, it discounted the harm because RE Land's problems are "largely of [its] own making." As to the

18

community, the trial court found that there was credible testimony from the neighbors that the truck parking operation causes substantial dust, noise, vibration, and visual blight, and, as to the Village, the trial court found that the inability to enforce its Code is "enormously consequential" in this case and other such cases where a party has disregarded local laws.

¶ 48 Accordingly, the trial court issued a preliminary injunction ordering RE: (1) to refrain from using the property as a truck parking lot in violation of the Code; and (2) to return the use and condition of the property, by February 20, 2024, to the last, actual, peaceable, uncontested status preceding the controversy, *i.e.*, the use and condition of the property prior to November 17, 2022, when the Village issued the stop-work order.

¶ 49 RE Land timely filed a notice of interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). Following supplemental briefing on the issue of our jurisdiction, pursuant to which both parties advanced arguments as the preliminary nature of the trial court's order, we agree that jurisdiction lies under Rule 307(a)(1).

¶ 50                                        II. ANALYSIS

¶ 51 Generally, a party seeking a preliminary injunction must demonstrate: (1) a clearly ascertainable right in need of protection, (2) irreparable harm without the injunction, (3) no adequate remedy at law for the injury, and (4) a likelihood of success on the merits. *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365-66 (2001). Here, the parties do not take issue with the trial court's rationale that, where a public body seeks an injunction to enforce an ordinance that expressly authorizes injunctive relief to enforce its provisions, irreparable harm and an inadequate remedy at law need not be shown, and make no separate arguments as to these elements. See *County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 634 (2005); *Village of Riverdale v. Allied Waste Transportation, Inc.*, 334 Ill. App. 3d 224,

19

228-29 (2002). A party seeking injunctive relief need only establish a "fair question" as to the existence of the claimed rights. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62 (2006). Once the requisite elements are met, the court generally must balance the hardships and consider the public interests involved. See *Makindu v. Illinois High School Ass'n*, 2015 IL App (2d) 141201, ¶ 31.[1]

¶ 52    A trial court's ruling on a preliminary injunction is reviewed for an abuse of discretion, and its factual findings are reviewed under the manifest-weight-of-the-evidence standard of review. *Hensley Construction, LLC v. Pulte Home Corp.*, 399 Ill. App. 3d 184, 190 (2010). To the extent the trial court's ruling involves a question of law, such as the interpretation of a legislative enactment, that issue is reviewed *de novo*. See *id.* An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view (see *Haage v. Zavala*, 2021 IL 125918, ¶ 40), and a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the finding is unreasonable, arbitrary, or not based on the evidence presented (see *Hensley Construction*, 399 Ill. App. 3d at 190). Under the *de novo* standard of review, we perform the same analysis that the trial court would perform. *Haage*, 2021 IL 125918, ¶ 41.

¶ 53    Initially, RE Land challenges the language of the preliminary injunction order for lack of specificity. See 735 ILCS 5/11-101 (West 2022) ("Every order granting an injunction *** shall set forth the reasons for its entry; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts to be restrained ***.")

---

[1] In *City of Rock Falls v. Aims Industrial Services, LLC*, 2024 IL 129164, ¶¶ 21-26, our supreme court recently held that a trial court lacks discretion to balance the equities in considering whether to grant *mandatory permanent* injunctive relief pursuant to an ordinance authorizing such relief once the municipality establishes a violation of the ordinance. Neither party cites this case, and we express no opinion on its applicability to the instant procedural context.

20

However, the trial court's order is clear—RE Land is prohibited from using the property as a truck parking business in violation of the Code and must return the use and condition of the property to its status prior to the issuance of the stop-work order. RE Land maintains that the order fails to preserve the status quo and suggests that the status quo is the status of the property as of the date of the evidentiary hearing. However, our supreme court has defined the status quo as "the last, actual, peaceable, uncontested status *which preceded the pending controversy*." (Emphasis added.) *Postma v. Jack Brown Buick, Inc.*, 157 Ill. 2d 391, 397 (1993). This is precisely what the trial court ordered. Namely, RE Land was ordered to return the use and condition of the property to the last, actual, peaceable, uncontested status preceding the controversy, *i.e.*, the use and condition of the property prior to November 17, 2022, when the Village issued the stop-work order. Accordingly, we reject any challenge to the language of the preliminary injunction order.

¶ 54    We turn to the central arguments raised on appeal. RE Land argues that the trial court erred in that: (1) state law preempts any action to enforce the Code's permit requirement and the trial court improperly found that RE Land is required to obtain a permit under the Code; (2) lack of a business license alone does not warrant injunctive relief; (3) the trial court erred in interpreting section 54-533 of the Code, and the trial court's findings with respect to RE Land's failure to construct the parking lot in accordance with the design standards for off-street parking and without adequate safety systems are against the manifest weight of the evidence; and (4) the annexation agreement and RE Land's affirmative defenses of "grandfathering," estoppel, and waiver preclude issuance of the preliminary injunction. The Village counters that: (1) RE Land forfeited preemption as an affirmative defense and, moreover, the evidence established that RE Land engaged in site development without a permit; (2) RE Land's undisputed failure to obtain a

business license warrants injunctive relief; (3) the trial court properly interpreted section 54-533, and the evidence established that the truck parking lot does not have the requisite all-weather dust-free surface, curbing, lighting, or adequate safety systems; and (4) neither the annexation agreement nor RE Land's other affirmative defenses excuse RE land's noncompliance with the Code. We address each argument in turn.

¶ 55                              A. Permit (Count II)

¶ 56          Initially, RE Land contends that the trial court disregarded its claim that state law preempts the Village's authority to regulate "state permitted fill activities at the property." The Village responds that RE Land forfeited any preemption claim by failing to raise it as an affirmative defense in the trial court. RE Land replies that it raised the issue of preemption in its answer to the complaint (alleging that RE Land continued to use the property in continuation of prior uses as authorized by the State); response to the Village's motion for a preliminary injunction (same); closing arguments (same); and draft order submitted to the trial court following the evidentiary hearing (asserting that RE Land's earth moving work was being done in accordance with the State-issued permits, not under the jurisdiction of the Village or the Code, and requesting that the trial court defer to the Illinois Environmental Protection Act (415 ILCS 5/1 *et seq.* (West 2022)) as it relates to the enforcement and definition of reclamation and related activity). A review of the record, however, demonstrates that these arguments were directed at RE Land's position that it was engaged in quarrying, fill, and reclamation, not advancement of a preemption defense. For the reasons set forth *infra*, the trial court's conclusion that the work performed at the property did *not* amount to these activities, and instead, amounted to the construction of a parking lot, was not against the manifest weight of the evidence. Thus, assuming for the sake of analysis that RE Land preserved preemption as a defense, its assertion

22

that only the State and other governmental bodies may regulate quarrying, fill, and reclamation activities is immaterial.

¶ 57　　　　Turning to the merits, section 16-61(a) of the Code requires a "site development permit" for, *inter alia*, "[a]ny land disturbing activity (*i.e.*, clearing, grading, stripping, excavation, fill, or any combination thereof) that will affect an area in excess of 5,000 square feet[.]" Bolingbrook Village Code § 16-61(a) (eff. Feb. 10, 1993). The trial court found that the Village established that RE Land engaged in land disturbing activity without the requisite site development permit. Namely, the Village established that, in November and December 2022, RE land regraded the southwest portion of the property (an area in excess of 5000 square feet) and raised the elevation by three feet. RE Land does not dispute not obtaining a site development permit. Rather, RE Land's response rests upon the annexation agreement's prohibition on enforcing the Village's "building, health, safety, zoning and fire codes *until such time as improvements or repairs are made to said structures*." (Emphasis added.) Village of Bolingbrook Ordinance No. 92-136, § 3(C) (approved Nov. 10, 1992). According to RE Land, the trial court's finding that its grading, elevation changes, and other work constitute an improvement to the property was against the manifest weight of the evidence. We disagree.

¶ 58　　　　In setting forth their respective arguments, the parties cite case law defining an "improvement to real property" for purposes of the construction statute of repose set forth in section 13-214(b) of the Code of Civil Procedure (735 ILCS 5/13-214(b) (West 2022)). As noted by our supreme court, an "improvement" is defined as " '[a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes.' " *St. Louis v. Rockwell Graphic Systems, Inc.*, 153 Ill. 2d 1,

23

4 (1992) (quoting Black's Law Dictionary 682 (5th ed. 1979)). Criteria relevant to the determination of what constitutes an "improvement to real property" under section 13-214(b) include whether the addition was meant to be permanent or temporary, whether it became an integral component of the overall system, whether the property value was increased, and whether the use of the property was enhanced. *Id.* at 4-5.

¶ 59        RE Land maintains that its work amounted to continued fill and grading operations and not an improvement to the property and cites Eastman's testimony that use of the property as a truck parking lot is not the highest and best use of the property. However, the evidence amply supported the trial court's finding that the truck parking lot amounts to an improvement to the property such that the annexation agreement does not prohibit the Village from enforcing its building, health, safety, zoning and fire codes. See Village of Bolingbrook Ordinance No. 92-136, § 3(C) (approved Nov. 10, 1992). Namely, given the amount of money RE Land paid in materials and labor to construct the parking lot, it cannot be disputed that the lot was a valuable addition made to the property. Moreover, the evidence reflected that the purpose of the construction was to enhance the utility of the quarry property and adapt the property for a new and further purpose—a truck parking business, which, according to RE Land itself, earned significant sums in monthly revenue. Accordingly, we cannot say that the trial court's finding that the truck parking lot constitutes an improvement was against the manifest weight of the evidence or that the trial court's issuance of a preliminary injunction as to count II was an abuse of discretion.

¶ 60                              B. Business License (Count III)

¶ 61        Section 13-23 of the Code prohibits the operation of any business without first having obtained a license for such business. RE Land does not dispute not obtaining a business license.

24

Rather, citing *County of Cook v. Hoytt*, 59 Ill. App. 2d 368 (1965), RE Land argues that failure to obtain a business license alone supports only a prosecution for a misdemeanor, not injunctive relief. In *Hoytt*, the property owner moved his house trailer onto his land without obtaining a permit. *Id.* at 370-71. In affirming summary judgment in the property owner's favor on the county's complaint for injunctive relief to remove the trailer, the appellate court reasoned that, since the owner would have been entitled to a permit had he requested one, the failure to obtain a permit did not convert the lawful use of the land into an unlawful one. *Id.* at 376-80. The court continued:

> "Assuming that under the statute the county has a right to require the owner to obtain a permit before making any use of his land, the owner's failure so to do could result only in a prosecution for a misdemeanor for violation of the ordinance requiring the owner to obtain a permit. Of course, if the use being made of the property was one not allowed in the particular district by the zoning ordinance, the county could successfully enjoin such use ***." *Id.* at 380.

¶ 62 Here, however, RE Land's failure to obtain a business license was but one of many Code violations, including failure to construct the truck parking lot with a proper surface, curbing, lighting, and safety systems. Thus, as the Village points out, unlike in *Hoytt*, it would not have issued RE Land a business license had RE Land requested one. Accordingly, RE Land presents no basis upon which to conclude that the trial court abused its discretion in issuing a preliminary injunction as to count III.

¶ 63                    C. Off-Street Parking Requirements (Count IV)

¶ 64 RE Land challenges the trial court's interpretation of section 54-533 of the Code, entitled "Design and maintenance," and its findings that the truck parking lot violates the Village's

25

standards for off-street parking. In relevant part, section 54-533 provides the following requirements for off-street parking facilities:

"(c) *Surfacing*. Every parking space, including access thereto, shall have an all-weather, dust-free surface and shall be so graded and drained as to dispose of surface water accumulation by means of a positive stormwater drainage system connected to a public drainageway.

(d) *Lighting*. Lighting used to illuminate off-street parking areas shall be provided as required in section 30-173(e).[2]

* * *

(i) *Curbing*. The perimeter of all parking areas providing space for five or more vehicles shall provide vehicular barriers. The vehicular barriers of such parking areas shall be continuous barrier curbing." Bolingbrook Village Code § 54-533 (eff. Sept. 24, 2013).

¶ 65    We address RE Land's arguments in turn.

¶ 66                                         1. Surfacing

¶ 67    RE Land does not dispute that the surface of its parking lot is comprised of asphalt grindings but challenges the trial court's interpretation of section 54-533(c)'s surfacing specification of an "all-weather, dust-free surface" to require hot asphalt, concrete, or brick. According to RE Land, the code provision is ambiguous, requiring that the ambiguity be resolved in favor of the free use of land. See *City of Chicago Heights v. Old Orchard Bank Trust Co.*, 96 Ill. App. 3d 789, 794 (1981) (noting that "[l]anguage in zoning ordinances should be

---

[2] Section 54-533(d) refers to section 30-173(*e*), but section 30-173(e) refers to testing standards, while section 30-173(*f*) sets forth the standards for commercial lighting. The parties refer only to section 30-173(f), as do we.

interpreted in favor of the free use of property" in holding that nursing home's housing of mentally ill persons did not violate zoning ordinance defining "nursing home" as place for "care of children or the aged or infirm"). Here, however, as the Village argues, section 54-533(c) governs the design and construction of the property, not the *use* of the property.

¶ 68 While the interpretation of a municipal ordinance is a question of law reviewed *de novo*, " 'a court will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute.' " *Peterson Plaza Preservation, L.P. v. City of Chicago Department of Finance*, 2019 IL App (1st) 181502, ¶ 17 (giving substantial deference to the department's interpretation of an ambiguous ordinance) (quoting *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 398 (1994)). The agency's interpretation expresses an informed source for ascertaining the legislative intent, and deference to the interpretation recognizes the agency's experience and expertise in making informed judgments on the issues. *Id.* (quoting *Bonaguro*, 158 Ill. 2d at 398). Here, Eastman, as the Village's Director of Community Development with responsibility to administer and enforce the Code, testified that asphalt grindings do not constitute an all-weather dust-free surface. Rather, Eastman explained that an all-weather dust-free surface means hot asphalt, concrete, or brick. The trial court found Eastman's testimony credible and noted that it was corroborated by what it found to be credible testimony from nearby residents regarding concern over the dust. In addition, noting the deference given to Eastman's interpretation of any ambiguity, the trial court discounted Zakharov's testimony that asphalt grindings constitute a dust-free surface as not only self-serving but also irrelevant.

¶ 69 RE Land contends that the trial court "ignored the testimony concerning the IEPA investigations and inspections" and that "[a]fter inspecting the Property on several occasions

27

after RE [Land] purchased it and trucks were parked there, the IEPA, with photographic evidence, concluded that the dust emanated from other sources, not the truck parking area." The Village responds that this contention "grossly misstates the record," pointing out that no witness from the IEPA testified and Zakharov merely testified that, in July 2023, an IEPA inspector visited the property once and found no violation with respect to dust. However, the issue below was not the extent to which the property was ultimately the source of all dust issues, but rather, the interpretation of section 54-533(c)'s surfacing specification of an "all-weather, dust-free surface" to require hot asphalt, concrete, or brick. RE Land presents no persuasive basis upon which to hold that the trial court erred in determining that the Village established that the parking lot does not comply with section 54-533(c) because it is comprised of asphalt grindings, and not paved with hot asphalt, concrete, or brick.

¶ 70                                                                     2. Lighting

¶ 71          Regarding the lighting requirement set forth in section 54-533(d), RE Land does not dispute that it did not install lighting at the truck parking lot. However, RE Land argues that the Code lacks minimum standards for the lighting of a truck parking area and thus, it could not have violated a "nonexistent" standard. However, section 54-533(d) provides that lighting used to illuminate off-street parking areas shall be provided as required in section 30-173(f), entitled "Commercial Lighting." Section 30-173(f) sets forth standards for commercial lighting in extensive detail. Moreover, the trial court explicitly found that the lack of lighting in the truck parking lot created significant safety issues. There is nothing in the record upon which to conclude that this finding was against the manifest weight of the evidence.

¶ 72                                                                     3. Curbing

28

¶ 73 Regarding the requirement in section 54-533(i) of the Code that the perimeter of the parking area provide vehicular barriers that amount to continuous barrier curbing, RE Land argues that the trial court overlooked that the temporary jersey barriers that RE Land installed performed the function of demarcating where the trucks could park. Initially, the Village argues that RE Land forfeited any claim that the jersey barriers satisfied the curbing requirement by failing to raise it in the trial court. The record reflects that RE Land presented evidence regarding the jersey barriers, although it made no argument that the barriers satisfied section 54-533(i)'s curbing requirement. Rather, it unsuccessfully argued that the parking lot was temporary and cited Zakharov's testimony that he would not have purchased the property if he believed that he had to comply with section 54-533. Assuming for the sake of analysis that the issue was squarely presented, the trial court, having considered the entirety of the record, found that the requisite curbing serves the important function of containing the vehicles on site and that the parking facility lacked such curbing. RE Land presents no basis upon which to hold that this finding was against the manifest weight of the evidence.

¶ 74 In sum, the trial court did not abuse its discretion in issuing a preliminary injunction as to count IV for violation of section 54-533's standards for off-street parking.

¶ 75 D. Safety Systems (Count V)

¶ 76 RE Land challenges the trial court's findings as to the lack of compliant lighting and a fire suppression system. As set forth above, there is nothing in the record upon which to conclude that the trial court's finding as to the lack of compliant lighting was against the manifest weight of the evidence. As to the fire suppression system, section 54-86 of the Code, entitled "Sewer and water facilities," provides:

"All structures built hereafter shall be served by and connected to a public sanitary sewage disposal system and water distribution system; existing structures not connected to a public sanitary sewage disposal system and water distribution system may be enlarged, repaired or altered without connection to the system provided that the failure to connect the structure shall not create a hazard to the public health, safety or welfare as provided in section 40-101 ["Discharge of harmful wastes prohibited"]. Bolingbrook Village Code § 54-86 (eff. Jan. 28, 1975).

¶ 77    RE Land contends that the trial court improperly discounted the testimony of Wheeler—its fire safety expert—who opined regarding the low probability of a fire occurrence at the property, that the severity of any such fire would be marginal and effectively fought with existing resources, and that the costly extension of sewer and water would not further fire safety protection. However, the trial court explicitly considered Wheeler's testimony but concluded that a low fire risk did not amount to a justifiable basis to disregard fire safety measures. Lajoie noted the importance of a fire suppression system given the large number of trucks carrying diesel fuel and the unknown nature of the trucks' contents, reinforced by Zakharov's admission that RE Land neither monitors nor regulates the contents of the trailers stored at the property. The trial court considered this testimony and the commonsense conclusion that fires are unpredictable and risk toxic release to neighboring communities. Accordingly, the trial court found that the evidence supported the need for a fire suppression system, and it was undisputed that RE Land never submitted a plan for such a system to the Village for evaluation. Having reviewed the testimony, there is simply no basis upon which to conclude that this finding was against the manifest weight of the evidence, and the trial court did not abuse its discretion in issuing a preliminary injunction as to count V for lack of safety systems.

30

¶ 78        As a final matter, RE Land maintains in summary fashion that the annexation agreement is also a defense to counts IV and V. However, we have already rejected RE Land's reliance on the annexation agreement as a defense to the issuance of a preliminary injunction as to count II for failure to obtain a permit, holding that that the annexation agreement does not prohibit the Village from enforcing its building, health, safety, zoning and fire codes. Thus, the annexation agreement likewise provides no defense to the issuance of a preliminary injunction as to count IV for violation of section 54-533's off-street parking requirements and count V for lack of safety systems.

¶ 79                                    E. Affirmative Defenses

¶ 80        RE Land argues that its affirmative defenses of "grandfathering," estoppel, and waiver preclude issuance of the preliminary injunction in its entirety. RE Land sets forth a collective argument as to the affirmative defenses, maintaining that the evidence established that H&H Stone, as the prior owner, had transformed a portion of the property into a truck parking area by building truck pads, reducing the berm, elevating the southwest corner to its current height, and allowing third parties to park and store their trucks, trailers, and industrial equipment and machinery there. Despite this activity, the Village never required a permit, plan, or any submission from H&H Stone, and never issued H&H Stone any citations. Indeed, on September 9, 2022, Eastman wrote to RE Land that there were no pending zoning action or outstanding zoning violations, and thereafter issued the September 29, 2022, tax clearance letter. Distilled, RE Land's argument is that H&H Stone's use of the property "grandfathered" RE Land's use of the southwest corner as a truck parking lot; that RE Land detrimentally relied upon the Village's preclosing representation that there were no pending zoning violations; and that the Village waived the ability to seek compliance because it never issued H&H Stone any citations.

31

¶ 81      The trial court explicitly rejected the premise of RE Land's affirmative defenses—that the work performed at the southwest portion of the property is a continuation of activity performed by H&H Stone. We see no basis in the record to conclude that this finding was against the manifest weight of the evidence. Indeed, Hamman (principal of H&H Stone) testified that H&H Stone only added fill to the property and merely created a generic flat area for potential subsequent development and use, and Duggan (counsel for H&H Stone) characterized the work performed at the southwest portion of the property as "construction work." The trial court further cited the lack of any nexus between the truck parking lot and quarry operations and noted the contrast between the fill activity during H&H Stone's ownership and the work performed to create the parking lot during RE Land's ownership, as borne out by Hamman's testimony. Toward this end, the trial court found it "transparently obvious that the scheme to have H&H pay outside contractors, and then receive reimbursement from Mr. Zakharov, was conceived by Mr. Zakharov [record citation] to create the illusion that the site development activity was nothing more than H&H continuing to do what it had done during the nine years it owned the quarry property." In sum, the trial court's rejection of RE Land's affirmative defenses was supported by the record, and the trial court did not abuse its discretion in issuing the preliminary injunction.

¶ 82                                      III. CONCLUSION

¶ 83      The judgment of the circuit court of Will County is affirmed.

¶ 84      Affirmed.